[Crim. No. 603. In Bank.—January 12, 1901.]

## THE PEOPLE, Respondent, v. SIMON ANDERSON, Appellant.

CRIMINAL LAW—CONVICTION OF MANSLAUGHTER—INSUFFICIENCY OF EVIDENCE—WHISKY GIVEN UNDER PHYSICIAN'S INSTRUCTION.—A conviction for manslaughter grounded on the criminal purpose or criminal negligence of the defendant in giving whisky to the deceased, which caused his death, cannot be supported where there is no evidence that defendant ever gave any whisky to the deceased except as a nurse in pursuance of the instruction of the attending physician, or that the deceased came to his death by reason of any act of the defendant.

ID.—LAST ILLNESS OF DECEASED—KEEPING LIQUOR FOR MEDICINAL USE.— Where it appears that the deceased lay confined to his bed in a very weak condition in the last stages of Bright's disease, the jury were not authorized to hold that it was criminal negligence for the defendant, as a nurse, to keep whisky in the room for medicinal use, or to keep a flask thereof beneath the mattress for such use, where there is no evidence that the deceased drank any of it other than as prescribed by his physician, and the testimony of the physician renders it improbable that he did so.

ID.—PROCURING OF CHECK FROM DECEASED—TAKING ADVANTAGE OF WEAKNESS.—The procuring of a check from the deceased by the defendant by taking advantage of the weakness and the impaired condition of the mind of the deceased, for mere purposes of greed, and the unsuccessful endeavor to cash the same, does not tend to show that whisky was given to him for that purpose, or that any act of the defendant caused his death.

APPEAL from a judgment of the Superior Court of Humboldt County and from an order denying a new trial. G. W. Hunter, Judge.

The facts are stated in the opinion of the court.

S. M. Buck, and J. F. Coonan, for Appellant.

Tirey L. Ford, Attorney General, and Charles P. Gale, for Respondent.

HARRISON, J.—The appellant was charged with the crime of murder in the killing of Thomas Kehoe, and upon his trial

therefor was convicted of manslaughter.   He has appealed from
the judgment entered thereon, upon the ground that the ver-
dict is not sustained by the evidence.   The evidence established
that Kehoe died from Bright's disease of the kidneys, superin-
duced by an excessive use of alcoholic drinks.   It is claimed
by the prosecution in support of the verdict that with the
knowledge that Kehoe had such a passion for whisky that his
death would result from an unrestrained use of it, the defend-
ant gave it to him to drink, or placed it within his reach, either
for the express purpose of producing his death, or with such
carelessness as to constitute a criminal negligence which would
make him responsible for his death.   There was no direct testi-
mony that the defendant ever gave any whisky to the deceased,
except in accordance with the directions of the attending physi-
cian, or was in any way instrumental in allowing him to obtain
any whisky, but it is claimed that the circumstances connected
with his death and the relations shown to have existed between
him and the defendant are sufficient to justify the verdict.

The deceased had for a long time been addicted to excessive
drinking, and for some time prior to his death was an inmate of
the hotel kept by the defendant.   In the early part of April,
1899, while at the defendant's hotel, he had an attack of de-
lirium tremens, and was under medical treatment therefor for
about a week.   After his recovery from this he remained un-
der medical treatment for other troubles for another week,
during a portion of which time the defendant was his nurse,
and after his recovery from this he went about the streets as
usual.   The record does not give any account of his condition
or doings from this time until after the 15th of May, except
that he continued to room at the hotel of the defendant, and
was occasionally seen upon the streets.   At some time between
the 15th and 20th of May he had evidently yielded to his pas-
sion for drink, and as a result thereof was taken with some kind
of sickness which confined him to his bed and required the at-
tendance of a nurse.   In the early part of this sickness the
defendant alone took care of him, but after the 20th of May an
employee, one Nilsen, who came into his service on that day,
assisted him, and thereafter, while the deceased remained at
the hotel, the defendant cared for him during the day and un-

til midnight, and during the remainder of the night Nilsen, who seems to have been a nightwatchman, relieved him by himself, looking into the room of the deceased at frequent intervals and ministering to his wants. Kehoe remained in the hotel until May 25th, when he was removed to a hospital, where he died on May 28th.

Dr. Ottmer, who had been the medical attendant of Kehoe during his sickness in April, was sent for by the defendant Monday afternoon, May 22d, and attended upon the deceased from that time until his death. He testified that he found Kehoe in bed, in a very weakened condition, and in an advanced stage of Bright's disease of the kidneys, from which he had been suffering prior to his first attendance upon him, and he gave instructions to the defendant to give him a tablespoonful of whisky every three hours. There is no evidence that from this time Kehoe was given or had any whisky except in accordance with this instruction. Neither is there any evidence that the defendant was present at any time when Kehoe drank any whisky, or in any way contributed to his drinking before he was taken down with his last illness, and although Dr. Ottmer says that Kehoe, when he saw him that evening, was as drunk as he could be, and must have drunk a great deal to have got into the condition he was in, it was not shown that the defendant was in any way connected therewith, or ever knew that he had been drinking until he took to his bed as the result thereof. Dr. Ottmer says that after his first visit Kehoe was sober whenever he called, and that at the first visit he did not want any whisky, since he had had all that he wanted; that he was sober after that evening because he could not keep any liquor on his stomach; that in his weak condition a very little would make him appear to be quite intoxicated.

It was shown by the prosecution that while Dr. Ottmer was attending Kehoe in April he advised him that if he continued to drink as he had been drinking it would kill him, and that the defendant was present when this advice was given; that during his sickness in May whisky was permitted to be in his room, and an opportunity afforded to Kehoe to get the same in the absence of his attendants; and it is urged that when the defendant assumed to nurse and care for him during his last

attack, it was an act of criminal negligence to permit any
whisky to be placed within the reach of Kehoe, or so that he
would have an opportunity to satisfy his craving for it.   As a
part of the evidence in support of this claim, it appears that
when Nilsen first began to assist the defendant there was a
pint flask of whisky in a drawer in Kehoe's room, but Nilsen
states that it was where Kehoe could not get at it.   It was also
shown that a flask of whisky was at one time upon a stand, and
that there was at another time a flask upon the bureau; but
as the defendant had been instructed to give Kehoe a table-
spoonful of whisky every three hours, and as it appeared that
Kehoe was too weak to get out of bed, the jury were not au-
thorized to hold that it was criminal negligence to allow the
flask to be in the room.

On Monday evening, May 24th, an attorney went to Kehoe's
room, together with Dr. Ottmer and a friend of Kehoe's, for
the purpose of having him execute his will, and they were after-
ward joined in the room by the defendant.   Kehoe's weakness
was so great that he could scarcely talk, and when the doctor
asked for whisky that he might give him a hypodermic injec-
tion of strychnine and whisky for the purpose of enabling him
to answer the questions put to him, the defendant reached
across the bed and took a small flask of whisky, partly filled,
from under the mattress at the side of the bed.   It is urged
from this fact that the jury were authorized to find that the
whisky was placed there by defendant to enable Kehoe to
get at it and drink it.   Aside from what has before been said
that there is no evidence that Kehoe did drink any of it, Dr.
Ottmer also testified that although it was within Kehoe's reach,
if he had drunk it, he could not keep it down, as he would
vomit even water.   It must also be borne in mind that the de-
fendant took the flask from the bed openly, in the presence
of several persons, and it is hardly to be supposed that, if he
had placed it there with any sinister motive, he would thus
publicly have betrayed himself.   Moreover, it is only a con-
jecture that the flask was placed there by the defendant.

Testimony was offered on the part of the prosecution that
on Monday afternoon, before the defendant sent for Dr. Ott-
mer, Kehoe made a check in favor of the defendant for two

thousand dollars, as a gift to him, and that the defendant had two persons affix their names as witnesses thereto; that immediately upon its receipt the defendant sought to have it cashed by the bank where he had been informed that Kehoe had money on deposit, but the bank, being suspicious, declined to pay it; that on Wednesday evening Kehoe, while his will was being prepared, disclaimed all knowledge of making the check, and although urged by the defendant to make some provision for him in his will, refused to do so. These facts are urged as showing motive on the part of the defendant that he desired the death of Kehoe in order that he might obtain his money.

If it be assumed that Kehoe made the check at the suggestion or request of the defendant, that fact has no tendency to show that the defendant gave him any whisky. A sufficient motive for obtaining the check would be found in a purpose to take a wicked advantage of the impaired condition of Kehoe's mind for mere purposes of greed, in the belief that his physical condition was such that he would never recover or know of having made the check. We are clearly of the opinion that there was no evidence before the jury from which they were authorized to find that Kehoe came to his death by reason of any act of the defendant.

The judgment is reversed and a new trial ordered.

McFarland, J., Temple, J., and Van Dyke, J., concurred.